IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TAMIKA TRICE,<br><br>           Plaintiff,<br><br>   v.<br><br>INFINITY STAFFING SOLUTIONS,<br>LLC doing business as Lyneer<br>Staffing Solutions,<br><br>           Defendant. | CIVIL ACTION FILE NO.<br><br>1:15-CV-3401-WSD-JFK |

## **FINAL REPORT AND RECOMMENDATION**

Plaintiff Tamika Trice filed the above-styled employment discrimination action against Defendant Infinity Staffing Solutions, LLC ("Infinity Staffing"), on September 28, 2015. [Doc. 1]. Plaintiff alleges that Defendant violated 42 U.S.C. § 1981 by discriminating against her in the terms and conditions of her employment on the basis of her race. [Doc. 1, Count I]. Plaintiff also alleges that Defendant subjected her to retaliation in violation of 42 U.S.C. § 1981. [Id., Count II]. Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Plaintiff's claims based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted to the court. [Doc. 81].

## I.     Facts

When evaluating the merits of a motion for summary judgment, the court must "view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party." Comer v. City of Palm Bay, Florida, 265 F.3d 1186, 1192 (11th Cir. 2001).  However, mere conclusions and unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005).  In accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendant's motion [Doc. 81] for summary judgment.

During the period of time relevant to this case, Plaintiff Tamika Trice worked for Staffmark which provided the labor force for the day shift at the Atlanta UPS Mail Innovations warehouse.  [Declaration of Takita Edwards ("Edwards Dec.") ¶¶ 5, 8; Deposition of Plaintiff Tamika Trice ("Pla. Dep.") at 35-37; Defendant's Statement of Material Facts ("DSMF") ¶ 10].  In October 2013, Defendant Infinity Staffing replaced Staffmark as the staffing company for certain positions at the Atlanta UPS warehouse. [DSMF ¶ 1].  Infinity Staffing accepted every former Staffmark employee who submitted an application.  [DSMF ¶ 2].  Most employees who transferred from

2

Staffmark to Infinity Staffing were transferred at their same rate of pay.  [DSMF ¶ 4].

During her tenure with Infinity Staffing, Plaintiff worked in the same position as a mail

sorter, had the same responsibilities, and received the same level of pay.  [DSMF ¶ 12].

During Plaintiff Trice's tenure, Infinity Staffing's management team for the

Atlanta UPS location was as follows: Indiana Palacios - On-Site Coordinator (Latino);

Veronica Burnice - Lead/Supervisor (African-American); Antonio Edler -

Lead/Supervisor (African-American); Carlos Lopez – On-Site Supervisor

(Latino/African-American); Anwar Ahmed – Support Services Manager (African-

American); and Robert Lake – Executive Vice President of Support (white).  [DSMF

¶ 3].  Infinity Staffing provides all of its managerial employees with annual training

on discrimination and retaliation.  The company also provides managerial employees

with policies delineating procedures for preventing and addressing discrimination and

retaliation, including investigating and escalating a complaint where appropriate.

[DSMF ¶ 6].

Infinity Staffing did not implement its formal employee handbook at UPS Mail

Innovations until after Plaintiff's tenure ended.  However, the company did display all

required Equal Employment Opportunity ("EEO") posters instructing employees how

to make a claim of discrimination or retaliation.  The company also gave management

3

phone numbers to employees should there be a need for them to make a complaint. In addition, Infinity Staffing distributed policies indicating the company's policy against harassment, discrimination, and retaliation, along with the procedures for reporting claims. [DSMF ¶ 9].

When Plaintiff Trice transferred to Infinity Staffing from Staffmark, On-Site Supervisor Carlos Lopez became her supervisor. [DSMF ¶ 10]. Plaintiff's mother, Doris Carthan, testified to the following:

> And then it got to the part that the man that was in charge like when the Mexicans were brought in, it was a Mexican man in charge that came in with them, then he was – the way he talked to [Trice] . . . like she had to do what he's saying and she's supposed to do whatever. And it's as if – I don't understand, I'm not a – I'm not a slave or anything. . . . That's the way it was coming out of her mouth like she didn't understand. And it was taking a toll . . . she said it was just like being back in the day. . . like being – looking at Roots or something as far as the picture that is on the black history picture. Like I'm a slave and I'm supposed to do what my servants say or whatever. And I'm not going to do that, momma. I'm not going to do it because they said – tell me to do it.

[Carthan Dep. at 48; DSMF ¶ 11].

Lead/Supervisor Veronica Burnice testified that at the time that Infinity Staffing took over at the UPS warehouse, Executive Vice President Robert Lake told her and Lead/Supervisor Antonio Edler that UPS wanted Infinity Staffing to "diversify" the workforce and that "UPS wanted to get more Hispanics." [Burnice Dec. ¶¶ 18, 19;

4

Burnice Dep. at 31-32; PSMF ¶ 4]. Employee Latisha DeSota worked under the supervision of Senior Recruiter Marisel Zayas. [PSMF ¶ 5]. According to DeSota's deposition testimony, Zayas said that she had been directed to diversify the warehouse workforce by hiring "a diverse workplace other than blacks. She needed more candidates that were not black." [DeSota Dep. at 11-12; PSMF ¶ 5].

DeSota and Support Services Manager Anwar Ahmed testified that more than 80 percent of the applicants for jobs at the UPS warehouse were black. [DeSota Dep. at 88; Ahmed Dep. at 79-80]. DeSota, however, testified that Zayas selected an equal ratio of black and non-black applicants for work at the warehouse. [DeSota Dep. at 27-33; PSMF ¶ 6]. DeSota also testified that Zayas referred to black applicants as "thugs" and "ghetto" and repeatedly directed DeSota to hire non-blacks based on race.[1] [DeSota Dep. at 10, 32-33, 88-89; PSMF ¶ 7].

Lead/Supervisor Veronica Burnice testified that when Executive Vice President Robert Lake visited the warehouse after Infinity Staffing took over, Lake selected black employees for termination on sight. According to Burnice, Lake also ordered

---

[1]Infinity Staffing terminated DeSota's employment on November 4, 2013, less than a month after she had reported concerns about the discriminatory recruitment and hiring processes to Zayas and Anwar Ahmed. [DeSota Dep. at 15-17, 41-43, 139-40, 163-64; PSMF ¶ 8].

5

that black workers not be called back to work because they were talking.  Burnice testified that at the same time, Lake praised Hispanic workers who worked more slowly than the black employees and also talked while working.  [Burnice Dec. ¶¶ 21-26; PSMF ¶ 10].

Plaintiff and Employee Takita Edwards testified that a Hispanic employee named Will, whom Infinity Staffing promoted to Lead/Supervisor, frequently used the word "nigger."[2]  [Pla. Dep. at 93-94; Edwards Dec. ¶¶ 23-26; PSMF ¶ 11].  According to Plaintiff and Edwards, Will used the word "nigger" around black employees and said it directly to them.  [Id.].  Edwards and Plaintiff reported this to Infinity Staffing's On-Site Supervisor Carlos Lopez, but Will continued his use of the word after they complained.  [Edwards Dec. ¶ 27-28; Pla. Dep. at 93-94; PSMF ¶ 12].

On December 2, 2013, Plaintiff asked Lopez when she and her colleagues would get raises, to which Lopez responded, "If you [were] Mexican, you would already have a raise."  [PSMF ¶ 13; DSMF ¶ 17].  Plaintiff testified:

> [O]nce he said that, we all looked around at each other like did he really just say that.  So I was like, Carlos, did you say that.  And he went to try to fix it by saying yes, I said it, but I meant if you was Hispanic and you could speak a different language then you'll have another opportunity of

---

[2]Plaintiff testified that she has also used the word "nigger." [Pla. Dep. at 93-95; DSMF ¶ 13].

working or something in that nature.  So once he said that, I was still
stunned that he told me if I was Mexican I'd have a raise.

[Pla. Dep. at 120].  The same day, while in Lopez's presence, Plaintiff reported his

discriminatory comment to Lead/Supervisor Veronica Burnice.  Plaintiff also told

Burnice that Lopez was lying when he gave his own, different characterization of what

he had said.  [Pla. Dep. at 122, 204-05; PSMF ¶ 14].  Also on the same day, Plaintiff

told Senior Recruiter Marisel Zayas that she was being discriminated against and that

black employees' hours were being cut, and she provided a written statement about

Lopez's comment.  [Pla. Dep. at 122; PSMF ¶ 15].  Shortly after Plaintiff finished

reporting Lopez's discriminatory actions to Zayas, Lopez dismissed Plaintiff from

work that day.  [Pla. Dep. at 122; PSMF ¶ 16].

The situation was escalated to senior management Executive Vice President

Robert Lake and Support Services Manager Anwar Ahmed, who conducted an

investigation into the matter. [DSMF ¶ 18].  Zayas alerted Lake via email that Plaintiff

"says she is being racially discriminated against."   [PSMF ¶ 17].   Plaintiff

subsequently "told [Lake] everything that had happened" with Lopez and added that

she was being discriminated against and that her hours were being cut.  [Pla. Dep. at

143, 145-46; PSMF ¶ 17].  Lake also spoke with Keyonna Davis, who corroborated

7

Plaintiff's version of Lopez's comment and provided a written statement.  [Davis Dep. at 70-71, 74-75, 128; PSMF ¶ 18].  After Lake and Ahmed investigated the event, they determined that both Plaintiff and Lopez had acted inappropriately but that there was no evidence that African-Americans were being denied a raise as Plaintiff had alleged.  [DSMF ¶ 20].  When Lake met with Plaintiff about his findings, he told her that Lopez was not a bad person and that Plaintiff misunderstood what Lopez had said about the raise.  [Pla. Dep. at 145; PSMF ¶ 19; DSMF ¶ 21].

On January 6, 2014, Plaintiff made a written complaint that On-Site Supervisor Lopez had removed her from the schedule because of the December 2, 2013, incident.  [PSMF ¶ 21; DSMF ¶ 23; Doc. 81-8, Ex. 6].  Senior Recruiter Zayas and Support Services Manager Ahmed alerted Executive Vice President Lake to Plaintiff's complaint, and Lake understood Plaintiff's grievance was that Lopez retaliated against her because of the December 2 incident.  [PSMF ¶ 22].  Lake and Ahmed called Plaintiff in response to her complaint, and she told them that she believed her hours had been cut as a result of her earlier race complaint on December 2, 2013.  Plaintiff also asked for more hours.  [PSMF ¶ 23].  When Lake investigated, Lopez told Lake that they had tried to schedule Plaintiff but that she indicated that she was unavailable or did not answer the phone when called so they focused on scheduling more reliable

8

people.  [DSMF ¶ 24].  Lopez also explained to Lake that there was a reduction in the volume of work and a limited availability of work after the seasonal rush.  [DSMF ¶ 25].  Lake told Lopez to do a better job about confirming Plaintiff's availability by contacting her in many ways, to schedule Plaintiff as much as possible and make her part of the core team, to avoid any behavior that might look like retaliation against Plaintiff, and to let senior management review any decisions made concerning Plaintiff.  [DSMF ¶ 27].

Plaintiff worked a total of 43.5 hours in November 2013 and 89.75 hours in December 2013.  [DSMF ¶ 16; PSMF ¶ 28].  After On-Site Supervisor Lopez took over scheduling, Plaintiff worked a total of 54.5 hours in January 2014 and 43.25 hours in February 2014.  [PSMF ¶ 28; DSMF ¶ 28].  The reduction in hours from December 2013 through February 2014 occurred despite the fact that, according to Lead/Supervisor Antonio Edler, Plaintiff's "work performance was great."  [PSMF ¶ 28].  Lake also testified that at some point during this time work "volumes were back up."  [Rule 30(b)(6) Dep. at 166-67].

Lead/Supervisor Veronica Burnice testified that Plaintiff's work hours were reduced and that Plaintiff frequently complained to Burnice about the fact that Lopez was not scheduling Plaintiff to work many hours.  [Burnice Dep. at 42-46].  Burnice

testified: "[Plaintiff] would come and ask why she's not called to be put on the schedule . . . why Carlos [Lopez was] not putting [her] on the schedule." [Burnice Dep. at 43]. Burnice testified that she confronted Lopez and other members of management about why the work hours of Plaintiff and other black workers were being reduced while the number of hours scheduled for Hispanic workers was increasing. [PSMF ¶ 29; Burnice Dep. at 27-33, 43-46, 53-58, 133-35]. When Burnice met with Lopez, she told him that the Hispanic workers to whom he was giving more hours were not as good as the black employees they replaced, which slowed down the mail processing. [PSMF ¶ 29; Burnice Dep. at 43-46, 133-35].

In December 2013, Plaintiff frequently met with Senior Recruiter Zayas at the branch office and asked for more hours. Plaintiff also told Zayas of her concerns about discrimination and retaliation and alleged that Lopez segregated the workers by race, retaliated against her, and cut her hours. [PSMF ¶ 30]. On January 11, 2014, Plaintiff submitted a request to work at certain start times for the week of January 13, which Infinity Staffing accommodated on two of the four days she worked that week. [DSMF ¶ 29].

10

During her tenure, Plaintiff had attendance problems, as did many other employees of all races.[3]  [Pla. Dep. at 113; DSMF ¶ 14].  Executive Vice President Lake discussed Plaintiff's attendance problems with senior management.  Lake then decided to issue Plaintiff a notice/write-up that was labeled a "Final Warning" for her alleged poor attendance and unreliable communications about scheduling.  [DSMF ¶ 32; PSMF ¶ 32; Doc. 81, Ex. 9; Doc. 95, Ex. 24].  At Lake's directive, Lopez gave Plaintiff the Final Warning on March 5, 2014.  [PSMF ¶ 32;  Doc. 81, Ex. 9; Doc. 95, Ex. 24].  When Lopez and Lake created the Final Warning for Plaintiff, they attached to it a version of Plaintiff's disciplinary log that began on December 23, 2013.[4]  [PSMF ¶ 37].  The written warning did not carry with it the loss of pay, opportunity to qualify

---

[3]Support Services Manager Anwar Ahmed trained On-Site Supervisor Carlos Lopez and his assistant, On-Site Coordinator Indiana Palacios, to log every employee concern, including all instances of lateness, absences, and scheduling difficulties. [PSMF ¶ 3].  Defendant Infinity Staffing, however, did not consistently enforce its written disciplinary policies regarding attendance and dependability because 90% of the employees either failed to report to work or reported late, 80% failed to report to work without calling at least once, and 50% failed to report to work without calling at least twice.  [PSMF ¶ 36; Rule 30(b)(6) Dep. at 208-09; Palacios Dep. at 62-64, 89-91, 95-100].  Furthermore, Infinity Staffing's time cards frequently showed employees clocking in late even though they had arrived to work on time.  [PSMF ¶ 47].

[4]The disciplinary log attached to the Final Warning omits the log's first entry, which records that Lopez sent Plaintiff home shortly after her December 2, 2013, discrimination complaint.  [PSMF ¶ 37].

11

for raises, or other penalties.  [DSMF ¶ 32].  However, the Final Warning stated: "Improvement on all areas is expected.  Failure to comply with policies could be use [sic] for grounds of termination."  [Doc. 81, Ex. 9; Doc. 95, Ex. 24].

On the Final Warning, Plaintiff wrote that the disciplinary action was an act of retaliation against her.  [DSMF ¶ 33].  Plaintiff also immediately met with Senior Recruiter Marisel Zayas and told her that the Final Warning was retaliatory and its substance was false.  [PSMF ¶ 38].  Plaintiff reiterated to Zayas her discrimination complaints as well, and she showed Zayas her cell phone, explaining that there were no missed calls from onsite staff.  [PSMF ¶ 39].  In response to the March 5th Final Warning, Plaintiff told Lake that she was being discriminated and retaliated against, that the attendance allegations in the log attached to the Final Warning were false, and that she felt the company was trying to fire her.  [PSMF ¶ 40].  Plaintiff also informed Lake that she had never received a written warning before being issued the Final Warning, a fact that Lake concedes was true.  [PSMF ¶ 40; Lake Dep. at 215].  Senior management determined that there was no evidence supporting Plaintiff's claim of retaliation.  [DSMF ¶ 34].

Plaintiff worked a total of 37.75 hours in March 2014.  [DSMF ¶ 35].  Her last day of work for Infinity Staffing was March 14, 2014.  [PSMF ¶ 41].  On-Site

12

Coordinator Indiana Palacios testified that on March 21, 2014, Plaintiff picked up her check at the warehouse.  [Palacios Dep. at 111-13].  According to Palacios, Plaintiff told him at that time that she was no longer "available to work due to issues going on at home."  [Id. at 112].  Palacios testified that Plaintiff told him that "she had a lot of personal things going on in her life and she just couldn't – she was not available for work."  [Id. at 112-13].  Palacios stated that Infinity Staffing took Plaintiff off the schedule at this point because "obviously we couldn't confirm her for work."  [Id. at 113].  Plaintiff, however, testified that she never asked to be taken off the schedule. Plaintiff also testified that she never told Infinity Staffing that she was unavailable to work or asked to be moved to a different location.  [Pla. Dep. at 310-14; PSMF ¶ 42]. Plaintiff testified that after her last day of work on March 14, 2014, she continued going to the branch office for at least a month, asking Zayas why she had been removed from the schedule and seeking work hours.  [Pla. Dep. at 211; PSMF ¶ 45]. She also submitted a form in April 2014 showing that she was medically cleared for work.  [DSMF ¶ 38].

Additional facts will be set forth as necessary during discussion of Plaintiff's claims.

## II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (amended 2010). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  See Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986).

The movant bears the initial burden of asserting the basis of his motion, and that burden is a light one.  See Celotex, 106 S. Ct. at 2553.  The movant is not required to negate his opponent's claim.  See id.  Rather, the movant may discharge this burden merely by "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id. at 2554.

14

When evaluating a motion for summary judgment, the court must view the evidence and factual inferences in the light most favorable to the nonmoving party. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1309 (11th Cir. 2001). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). Instead, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)).

The court will apply these standards in ruling on Defendant's motion for summary judgment.[5]

---

[5]Plaintiff has filed a notice of objection to Defendant's use of the declarations of Kiara McDaniel, Marilyn Ware, Steve Oliney, Osumanu Akaba, and Marian Thomas. [Doc. 81-9; Doc. 93 at 1-3]. Plaintiff argues that the court should not consider the declarations because Defendant did not identify these witnesses in a timely manner. [Id.]. In the declarations, the witnesses assert that they did not witness racial discrimination and that they were not treated in a racially discriminatory manner. [Doc. 81-9]. The court will not consider the cited declarations because they do not contain any evidence relevant to an evaluation of Defendant's summary judgment motion. The court need not determine at this time whether Defendant failed to properly disclose the witnesses.

Plaintiff also claims that the court should not consider Defendant's affirmative defense based on evidence of Plaintiff's wrongdoing discovered by the employer after her termination. [Doc. 93 at 3-8]. Plaintiff argues that Defendant should not be

15

### III.   Discussion

### A.   Race Discrimination Claim

Plaintiff Tamika Trice alleges that Defendant Infinity Staffing subjected her to racial discrimination in violation of 42 U.S.C. § 1981 by denying her a raise, reducing her work hours, and terminating her employment.[6]  [Doc. 1, Count I].  Section 1981 provides, in pertinent part: "All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens. . . ."  42 U.S.C. § 1981(a).  In a disparate treatment action, the plaintiff carries the burden of demonstrating that the defendant has unlawfully discriminated against her.[7]  See Texas Dep't of Community

---

permitted to rely on "after-acquired" evidence because Executive Vice President Lake testified at the Rule 30(b)(6) deposition that the company had not "learned of anything after Ms. Trice's employment ended that it says would have caused the company to terminate Ms. Trice if it had known about it at the time she was employed."  [Rule 30(b)(6) Dep. at 93].  The court has considered the after-acquired evidence cited by Defendant, which consists of brief portions of the depositions of Plaintiff's husband and mother, because the depositions were conducted only six days before the Rule 30(b)(6) deposition took place and, as Defendant argues, the issue involves a particular legal defense.  [Doc. 84-1 at 25; Dewberry Dep. at 67:6-8; Carthan Dep. at 60:16-19].  However, as discussed *infra*, although Defendant's after-acquired argument has been considered, the undersigned has concluded that it fails.

[6]Plaintiff asserts in the alternative that she was constructively discharged because of her race.  [Doc. 1, Count I].

[7]In evaluating Plaintiff's claims, the undersigned has cited to a number of employment discrimination cases analyzing claims based on Title VII of the Civil

AO 72A
(Rev.8/82)

Affairs v. Burdine, 101 S. Ct. 1089, 1093-95 (1981).  "A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof."  Rioux v. City of Atlanta, Georgia, 520 F.3d 1269, 1274 (11th Cir. 2008).

In the present case, because Plaintiff relies on circumstantial evidence, the court will use the framework articulated in McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817, 1824-25 (1973), to evaluate her racial discrimination claim.  Under this framework, the allocation of burdens and order of presentation and proof are as follows: (1) the plaintiff has the burden of proving a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden (of production) shifts to the defendant to articulate some legitimate, non-discriminatory reason for the action taken against the employee; and (3) should the defendant carry this burden, the plaintiff must have an opportunity to prove that the legitimate reason offered by defendant was a pretext for discrimination.  See id.  One way that Plaintiff

---

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*  Although Plaintiff's claims are brought pursuant to 42 U.S.C. § 1981 and not Title VII, "[b]oth of these statutes have the same requirements of proof and use the same analytical framework[.]"  Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); accord Brown v. Alabama Dep't of Transp., 597 F.3d 1160, 1174 n. 6 (11th Cir. 2010) ("The analysis under [§ 1981] claims mirrors that under Title VII."); Springer v. Convergys Customer Mgmt. Group Inc., 509 F.3d 1344, 1347 n.1 (11th Cir. 2007).

17

may establish a *prima facie* case of racial discrimination is by showing: (1) she is a member of a racially protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside her protected class more favorably; and (4) she was qualified to do the job.  See Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008); McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008).  Courts, however, are not to apply the elements of a *prima facie* case in a rigid or mechanical way.  See United States Postal Serv. Bd. of Gov. v. Aikens, 103 S. Ct. 1478, 1482 (1983) ("The *prima facie* case method established in McDonnell Douglas was never intended to be rigid, mechanized, or ritualistic.") (internal quotations omitted) (citing Furno Construction Corp. v. Waters, 98 S. Ct. 2943, 2949 (1978)); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination is present.*") (emphasis added).

As Defendant acknowledges, Plaintiff is able to establish the first and last *prima facie* elements because she is African-American and was qualified to perform her job. [Doc. 84-1 at 9].  With respect to the second *prima facie* element, the Eleventh Circuit has held, "[O]nly those employment actions that result in 'a *serious and material* change in the terms, conditions, or privileges of employment' will suffice."  Howard

18

v. Walgreen Co., 605 F.3d 1239, 1245 (11th Cir. 2010) (quoting Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original)). "'Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.'" Id. (quoting Davis, 245 F.3d at 1239).  Defendant acknowledges that Plaintiff was subjected to an adverse action because she never received a pay raise while many of her co-workers were given raises. [DSMF ¶ 12; Doc. 84-1 at 13-14].  The court also finds that Plaintiff is able to show that she was subjected to employment actions that were materially adverse when her work hours were reduced and her employment was terminated.

Defendant argues that Plaintiff did not suffer an adverse employment action when she was issued her work schedule. [Doc. 84-1 at 9-10].  Plaintiff worked a total of 43.5 hours in November 2013 and 89.75 hours in December 2013.  [DSMF ¶ 16; PSMF ¶ 28].  After On-Site Supervisor Carlos Lopez took over scheduling, Plaintiff worked a total of 54.5 hours in January 2014 and 43.25 hours in February 2014. [PSMF ¶ 28; DSMF ¶ 28].  While Plaintiff's work hours viewed in isolation do not establish that she was subjected to an adverse action, other evidence in the record supports Plaintiff's assertion that her hours were reduced.  Lead/Supervisor Veronica

19

Burnice testified that Plaintiff's work hours were cut and that Plaintiff frequently complained to Burnice about the fact that Lopez was not scheduling Plaintiff to work many hours. [Burnice Dep. at 42-46]. Burnice testified: "[Plaintiff] would come and ask why she's not called to be put on the schedule . . . why Carlos [Lopez was] not putting [her] on the schedule." [Burnice Dep. at 43]. This evidence would permit a reasonable jury to conclude that Plaintiff suffered a materially adverse action when her work hours were cut.

Turning to Plaintiff's termination, Defendant argues that Plaintiff voluntarily resigned when she asked to be removed from the schedule in March 2014. [Doc. 84-1 at 10]. Plaintiff's last day of work for Infinity Staffing was March 14, 2014. [PSMF ¶ 41]. On-Site Coordinator Indiana Palacios testified that on March 21, 2014, Plaintiff picked up her check at the warehouse and said that she was no longer "available to work due to issues going on at home." [Palacios Dep. at 111-13]. Palacios stated that Infinity Staffing took Plaintiff off the schedule at this point because "obviously we couldn't confirm her for work." [Id. at 113]. Plaintiff disputes this testimony and testified that she never asked to be taken off the schedule. [Pla. Dep. at 310-14]. According to Plaintiff, she never told Infinity Staffing that she was unavailable to work or asked to be moved to a different location. [Pla. Dep. at 310-14; PSMF ¶ 42].

20

Plaintiff testified that after her last day of work on March 14, 2014, she continued going to the branch office for at least a month, asking Senior Recruiter Marisel Zayas why she had been removed from the schedule and seeking work hours.  [Pla. Dep. at 211; PSMF ¶ 45].  She also submitted a form in April 2014 showing that she was medically cleared for work.  [DSMF ¶ 38].  But Defendant never scheduled her to work after March 14, 2014.  [PSMF ¶ 41].  A jury viewing this evidence in the light most favorable to Plaintiff could conclude that Defendant terminated her employment. Therefore, Plaintiff is able to show that she was subjected to adverse employment actions when she was denied a raise, her work hours were reduced, and her employment was terminated.

With regard to the third and final *prima facie* element, Plaintiff does not dispute Defendant's argument that she is unable to identify a similarly situated comparator outside her class who was treated more favorably.  [Doc. 95 at 15].  But Plaintiff correctly notes that in <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321 (11th Cir. 2011), the Eleventh Circuit wrote that "the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case.  Rather, the plaintiff will always survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  <u>Id.</u> at 1328.  Summary judgment is

improper "if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" Id. (quoting Silverman v. Bd. of Educ. of City of Chicago, 637 F.3d 729, 734 (7th Cir. 2011)). Nevertheless, this court has explained:

> Smith does not represent an alternative analytical framework to that established by McDonnell Douglas and its progeny; instead, it sets out an alternative way for plaintiffs to satisfy the prima facie case requirement and clarifies the summary-judgment standard in Title VII cases. Put simply, Smith holds that plaintiffs can establish a prima facie case, as required by McDonnell Douglas and its follow-on cases, without pointing to a similarly situated comparator.

King v. Ferguson Enterprises, Inc., 971 F. Supp. 2d 1200, 1214 (N.D. Ga. 2013), aff'd, 568 Fed. Appx. 686 (11th Cir. 2014) (per curiam). Thus, at the *prima facie* stage under McDonnell Douglas, a "Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." Int'l Brotherhood of Teamsters v. United States, 97 S. Ct. 1843, 1866 (1977). The undersigned concludes that Plaintiff Trice is able to carry this burden.

Plaintiff alleges that Defendant did not give her a pay raise based on her race. [Doc. 1 ¶ 79]. In support of this allegation, Plaintiff cites to a conversation she had

22

with Carlos Lopez, her On-Site Supervisor, on December 2, 2013. [DSMF ¶¶ 10, 17; PSMF ¶ 13]. Plaintiff testified that she asked Lopez when she and her colleagues would get raises, to which Lopez responded, "If you [were] Mexican, you would already have a raise." [PSMF ¶ 13; DSMF ¶ 17]. Plaintiff testified:

> [O]nce he said that, we all looked around at each other like did he really just say that. So I was like, Carlos, did you say that. And he went to try to fix it by saying yes, I said it, but I meant if you was Hispanic and you could speak a different language then you'll have another opportunity of working or something in that nature. So once he said that, I was still stunned that he told me if I was Mexican I'd have a raise.

[Pla. Dep. at 120]. The alleged comment by Lopez does not constitute direct evidence of discrimination because there is no evidence that he was involved in decisions about pay raises. See East v. Clayton County, Georgia, 436 Fed. Appx. 904, 910 (11th Cir. 2011) ("'[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.'") (quoting Standard, 161 F.3d at 1330). However, the comment would be sufficient to permit a reasonable jury to conclude that the decision not to give Plaintiff a raise was based on her race, African-American.

Plaintiff also argues that record evidence creates an inference that Defendant reduced her hours and terminated her employment on the basis of her race. The court

agrees.   Lead/Supervisor Veronica Burnice testified that at the time that Infinity Staffing became responsible for staffing at the UPS warehouse, Executive Vice President Robert Lake told her and Lead/Supervisor Antonio Edler that UPS wanted Infinity Staffing to "diversify" the workforce and that "UPS wanted to get more Hispanics."  [Burnice Dec. ¶¶ 18, 19; Burnice Dep. at 31-32; PSMF ¶ 4].  According to Burnice, shortly after this conversation, she observed that the work hours of Plaintiff and other black workers were being reduced while the number of hours scheduled for Hispanic workers was increasing.  Burnice also testified that she confronted Lopez and other members of management about this fact.  [PSMF ¶ 29; Burnice Dep. at 27-33, 43-46, 53-58, 133-35].   In addition, Burnice testified that when Lake visited the warehouse after Infinity Staffing took over, Lake selected black employees for termination on sight and ordered that black workers not be called back to work because they were talking, while praising Hispanic workers who worked more slowly than the black employees and also talked while working.  [Burnice Dec. ¶¶ 21-26; PSMF ¶ 10].

Employee Latisha DeSota, who worked under the supervision of Senior Recruiter Marisel Zayas, offered similar testimony.  According to DeSota, Zayas said that she had been directed to diversify the warehouse workforce by hiring "a diverse workplace other than blacks.  She needed more candidates that were not black."

24

[DeSota Dep. at 11-12; PSMF ¶ 5].  DeSota and Support Services Manager Anwar Ahmed testified that more than 80 percent of the applicants for jobs at the UPS warehouse were black.  [DeSota Dep. at 88; Ahmed Dep. at 79-80].  DeSota, however, testified that Zayas selected an equal ratio of black and non-black applicants for work at the warehouse.  [DeSota Dep. at 27-33; PSMF ¶ 6].  DeSota also testified that Zayas referred to black applicants as "thugs" and "ghetto" and repeatedly directed DeSota to hire non-blacks based on race.  [DeSota Dep. at 10, 32-33, 88-89; PSMF ¶ 7].  The court finds that Plaintiff has presented "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination" with respect to her alleged termination and the reduction in her work hours.  Smith, 644 F.3d at 1328 (citation and internal quotation marks omitted).

Plaintiff, therefore, has established a *prima facie* case of racial discrimination on her claims that Defendant violated § 1981 when it denied her a raise, reduced her work hours, and terminated her employment.  As a result, the burden (of production) shifts to Defendant to articulate some legitimate, non-discriminatory reason for the actions taken against Plaintiff.  See Combs v. Plantation Patterns, 106 F. 3d 1519, 1528 (11th Cir. 1997) (citing McDonnell Douglas, 93 S. Ct. at 1824; Burdine, 101 S. Ct. at 1094).  "'[T]o satisfy this intermediate burden, the employer need only produce

AO 72A
(Rev.8/82)

admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not* been motivated by discriminatory animus.'" Id. (quoting Burdine, 101 S. Ct. at 1096) (emphasis in original).  A "'defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'"  Id. (quoting Burdine, 101 S. Ct. at 1094).  The defendant's burden in the rebuttal stage is "'exceedingly light.'"  Walker v. NationsBank of Florida N.A., 53 F.3d 1548, 1556 (11th Cir. 1995) (quoting Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983)).

Defendant alleges that Plaintiff "asked to be removed from the schedule" and that her "resignation was completely voluntary."  [Doc. 84-1 at 16].  As a result, Defendant argues that it is not required to offer a legitimate, non-discriminatory reason for terminating Plaintiff's employment.  [Id.].  Defendant then contends that assuming a legitimate reason is necessary, Plaintiff was terminated because of her poor attendance and/or because of personal animosity between Lopez and Plaintiff, not because of racial animus.  [Id.].  Defendant also asserts that Plaintiff "was removed from the schedule once in December 2013 due to a slow down and there being less work."  [Doc. 84-1 at 15].  According to Defendant, the "scheduling changes that Trice

26

experienced were common to all employees after Infinity Staffing took over from the previous staffing company" and the "changes applied across the board without respect to race." [Id.].  With regard to Plaintiff's claim that she did not receive a raise, Defendant writes, "The standard for raises was not subject to Lopez's discretion, but instead was set by an employee working a threshold number of hours, which had nothing to do with race." [Doc. 84-1 at 19].  The court finds that Defendant has satisfied the light burden of offering legitimate, non-discriminatory reasons for the actions taken against Plaintiff.

Once a defendant meets its burden of production, "the presumption of discrimination created by the McDonnell Douglas framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'" Combs, 106 F.3d at 1528 (quoting Burdine, 101 S. Ct. at 1094-95 & n.10).  The plaintiff then "has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." Holifield, 115 F.3d 1565 (citing McDonnell Douglas, 93 S. Ct. at 1825).  "[A] plaintiff may not in all cases merely rest on the laurels of her *prima facie* case in the face of powerful justification evidence offered by the defendant." Grigsby v. Reynolds Metals Co., 821 F.2d 590, 596 (11th Cir. 1987).  Plaintiff's demonstration of pretext merges with her "ultimate

27

burden of showing that the defendant intentionally discriminated against the plaintiff." Holifield, 115 F.3d at 1565 (citing St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742, 2749 (1993)). This task is a highly focused one.

The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct[.]'" Combs, 106 F.3d at 1538 (quoting Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994)). Plaintiff "'may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Jackson v. State of Alabama State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting Burdine, 101 S. Ct. at 1095). In order to establish pretext through the indirect method, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." McCann, 526 F.3d at 1375-76 (citations and internal quotation marks omitted).

As noted *supra*, Defendant alleges that Plaintiff was not terminated, but Plaintiff disputes this allegation.  [Pla. Dep. at 310-14].  Defendant argues that even assuming that Plaintiff was fired, the termination was due to her poor attendance.[8]  [Doc. 84-1 at 16].  But Defendant acknowledged that it did not consistently enforce its written disciplinary policies regarding attendance and dependability.  The evidence reveals that 90% of employees either failed to report to work or reported late, 80% failed to report to work without calling at least once, and 50% failed to report to work without calling at least twice.  [PSMF ¶ 36; Rule 30(b)(6) Dep. at 208-09; Palacios Dep. at 62-64, 89-91, 95-100].  Furthermore, Defendant's time cards frequently showed employees clocking in late even though they had arrived to work on time.  [PSMF ¶ 47].

Defendant asserts that Plaintiff's work hours were reduced due to a slow down and that Plaintiff's schedule changes were common to all employees and applied across the board regardless of race.  [Id. at 15].  But Lead/Supervisor Veronica Burnice testified that the work hours of Plaintiff and other black workers were being reduced while the number of hours scheduled for Hispanic workers was increasing.  [PSMF ¶

---

[8]Defendant also contends that Plaintiff was fired because of personal animosity between Lopez and Plaintiff, but as discussed *infra*, a jury could find that racial animus played a role in the decision to terminate Plaintiff's employment.  [Doc. 84-1 at 16].

29; Burnice Dep. at 27-33, 43-46, 53-58, 133-35].  These facts cast doubt on the truthfulness of Defendant's proffered legitimate reasons.

More important, the evidence in the record would support a finding that Defendant subjected Plaintiff to the complained-of actions based on racial animus.  As previously noted, Burnice testified that when Defendant took over at the UPS warehouse, Executive Vice President Robert Lake told her and Lead/Supervisor Antonio Edler that UPS wanted Infinity Staffing to "diversify" the workforce and that "UPS wanted to get more Hispanics."  [Burnice Dec. ¶¶ 18, 19; Burnice Dep. at 31-32; PSMF ¶ 4].  Burnice subsequently observed that the work hours of Plaintiff and other black workers were being reduced while the number of hours scheduled for Hispanic workers was increasing.  [PSMF ¶ 29; Burnice Dep. at 27-33, 43-46, 53-58, 133-35].  In addition, Burnice testified that Lake selected black employees for termination on sight and ordered that black workers not be called back to work because they were talking, while praising Hispanic workers who worked more slowly than the black employees and also talked while working.  [Burnice Dec. ¶¶ 21-26; PSMF ¶ 10].

Employee Latisha DeSota testified that Senior Recruiter Marisel Zayas stated that she had been directed to diversify the warehouse workforce by hiring "a diverse workplace other than blacks.  She needed more candidates that were not black."

[DeSota Dep. at 11-12; PSMF ¶ 5].  DeSota also testified that Zayas referred to black applicants as "thugs" and "ghetto" and repeatedly directed DeSota to hire non-blacks based on race.  [DeSota Dep. at 10, 32-33, 88-89; PSMF ¶ 7].  And while Defendant claims that Plaintiff did not receive a raise because the standard for raises "was set by an employee working a threshold number of hours, which had nothing to do with race," Plaintiff testified that in December 2013, Lopez informed Plaintiff and her black colleagues, "If you [were] Mexican, you would already have a raise."  [Doc. 84-1 at 19; PSMF ¶ 13; DSMF ¶ 17; Pla. Dep. at 120].

A reasonable jury presented with this evidence could conclude that "a discriminatory reason more likely motivated the employer'" when it took the various complained-of actions against Plaintiff.  Jackson, 405 F.3d at 1289 (quoting Burdine, 101 S. Ct. at 1095).  The court, therefore, finds that Plaintiff has carried her burden of showing that Defendant's proffered reasons for the adverse employment actions are pretexts for racial discrimination.  See Holifield, 115 F.3d at 1565.  It is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 81] be **DENIED** on Plaintiff's 42 U.S.C. § 1981 claim [Doc. 1, Count I] that Defendant denied her a raise, reduced her work hours, and terminated her employment on the basis of her race.

**B.**     **Retaliation Claim**

Plaintiff Trice asserts that Defendant Infinity Staffing subjected her to retaliation in violation of 42 U.S.C. § 1981 by reducing her work hours and terminating her employment. [Doc. 1, Count II; Doc. 95 at 20].[9]  Section 1981 "prohibits retaliation based on race, even though the statute is silent on that cause of action." Worley v. City of Lilburn, 408 Fed. Appx. 248, 250 (11th Cir. 2011) (citing CBOCS West, Inc. v. Humphries, 128 S. Ct. 1951 (2008)).  In University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517, 2534 (2013), the Supreme Court held that a plaintiff bringing a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  Although Nassar was a Title VII retaliation case, courts have applied the "but-for" standard of causation to retaliation claims brought pursuant to 42 U.S.C. § 1981.  See Billingsley v. Mercedes-Benz U.S., Int'l, Inc., 2016 WL 5341101, at *5 (N.D. Ala. September 23, 2016); Brown v. CRST Malone, Inc., 2014 WL 4681363, at *19 (N.D. Ala. September 17, 2014) (applying "the 'but-for' causation standard to [plaintiff's] retaliation claim under § 1981 as well as the Title VII retaliation claim"); Parker v. Chilton County Bd.

---

[9]Plaintiff does not argue that the denial of a pay raise was retaliatory.  [Doc. 95 at 20].

of Educ., 2014 WL 116341, at *10 & n.9 (M.D. Ala. January 13, 2014) (holding that

Nassar applies to § 1981 retaliation claims).  The Eleventh Circuit has held that the

burden-shifting framework set forth in McDonnell Douglas continues to apply after

Nassar.  See Mealing v. Georgia Dep't of Juvenile Justice, 564 Fed. Appx. 421, 427

n.9 (11th Cir. 2014).

"To establish a claim of retaliation under Title VII or section 1981, a plaintiff

must prove that [she] engaged in statutorily protected activity, [she] suffered a

materially adverse action, and there was some causal relation between the two events."

Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008) (citing

Burlington Northern and Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2410-16

(2006)); accord Mealing 564 Fed. Appx. at 427.  The plaintiff "'need not prove the

underlying claim of discrimination which led to [her] protest;' however, the plaintiff

must have had a reasonable good faith belief that the discrimination existed."

Holifield, 115 F.3d at 1566 (quoting Tipton v. Canadian Imperial Bank of Commerce,

872 F.2d 1491, 1494 (11th Cir. 1989)).  "To establish causation for purposes of a Title

VII retaliation claim, the plaintiff must prove that 'the unlawful retaliation would not

have occurred in the absence of the alleged wrongful action or actions of the

33

employer.'"  Taylor v. Cardiovascular Specialists, P.C., 4 F. Supp. 3d 1374, 1383

(N.D. Ga. 2014) (quoting Nassar, 133 S. Ct. at 2533).

The parties agree that Plaintiff is able to establish the first *prima facie* element,

statutorily protected activity, because she complained about racial discrimination and

retaliation to members of Infinity Staffing management beginning on December 2,

2013.  [Doc. 84-1 at 20-21; Doc. 95 at 19].  The second element requires Plaintiff to

show that she suffered an adverse employment action.  "[T]he 'adverse action' test

applied to retaliation claims is distinct from that applied to disparate treatment claims."

Sharpe v. Global Sec. Intern., 766 F. Supp. 2d 1272, 1291 (S.D. Ala. 2011).  The

Supreme Court has held that a plaintiff bringing a retaliation claim "must show that a

reasonable employee would have found the challenged action materially adverse,

which in this context means it well might have dissuaded a reasonable worker from

making or supporting a charge of discrimination."  Burlington Northern, 126 S. Ct. at

2415 (citations and internal quotation marks omitted).  This standard for determining

adverse actions in retaliation claims is "decidedly more relaxed" than that used in

discrimination claims.  Crawford, 529 F.3d at 973.  For the reasons discussed *supra*

with respect to Plaintiff's racial discrimination claim, the court finds that Plaintiff is

34

able to show that she suffered materially adverse actions when her work hours were reduced and her employment was terminated.  [Doc. 95 at 20].

To establish the final element of a *prima facie* case of retaliation, Plaintiff must offer evidence which would allow a reasonable factfinder to conclude that there was a causal connection between the protected activity and the adverse employment action. See Mealing, 564 Fed. Appx. at 427.  If an employer takes an adverse employment action against an employee shortly after becoming aware of the employee's protected expression, then the close temporal proximity between the two events "is generally sufficient for a plaintiff to establish but-for causation."  Abernathy v. Science Applications Intern. Corp., 2013 WL 6904089, at *1 (N.D. Ala. December 31, 2013) (citing Raspanti v. Four Amigos Travel, Inc., 266 Fed. Appx. 820, 823 (11th Cir. 2008) (noting that at summary judgment the plaintiff bringing an FLSA retaliation claim can satisfy the but-for causal relation element "if she can prove a 'close temporal proximity' between the time her employer learned about her protected activity and her discharge")); accord Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.").  In Clark

35

County School Dist. v. Breeden, 121 S. Ct. 1508, 1511 (2001), the Supreme Court stated that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . must be 'very close[.]'"

The court finds that the relevant facts would permit a reasonable jury to find that there was a "but-for" causal link due to the close temporal proximity between Plaintiff's protected activity and her reduction in work hours and termination. Plaintiff first engaged in protected activity on December 2, 2013, when she reported to Lead/Supervisor Veronica Burnice and Senior Recruiter Marisel Zayas that On-Site Supervisor Carlos Lopez had said to Plaintiff and other black employees, "If you [were] Mexican, you would already have a raise." [PSMF ¶¶ 13-15; DSMF ¶ 17; Pla. Dep. at 122, 204-05; PSMF ¶ 14]. Lopez was aware of Plaintiff's complaint and dismissed Plaintiff from work that same day. [Pla. Dep. at 122; PSMF ¶ 16].

Plaintiff made a written complaint on January 6, 2014, alleging that Lopez had retaliated against her for the incident on December 2, 2013. [PSMF ¶ 21; DSMF ¶ 23; Doc. 81-8, Ex. 6]. Plaintiff was issued a Final Warning less than two months later, on March 5, 2014. [PSMF ¶ 32; Doc. 81, Ex. 9; Doc. 95, Ex. 24]. However, Executive Vice President Robert Lake concedes that Plaintiff never received a written warning before being issued the Final Warning. [PSMF ¶ 40; Lake Dep. at 215]. This sudden

issuance of negative documentation is additional evidence of retaliatory animus.  See Weaver v. Casa Gallardo, 922 F.2d 1515, 1525 (11th Cir. 1991), superseded by statute on other grounds ("The pronounced increase in negative reviews and the careful scrutiny of Weaver's performance . . . is sufficient to establish a causal link.").  On the Final Warning, Plaintiff alleged that the disciplinary action was retaliatory.  [DSMF ¶ 33].  Plaintiff also engaged in protected activity shortly after the March 5th warning when she complained to Zayas and Lake that she had been subjected to retaliation and discrimination.  [PSMF ¶¶ 38, 40].  According to Plaintiff, Defendant effectively terminated her employment after March 14, 2014, because the company did not schedule her to work at any point after this date which was less than ten days after Plaintiff complained to Zayas and Lake.  [PSMF ¶ 41].  This evidence is sufficient to create a genuine issue of material fact of a causal connection.  Plaintiff, therefore, is able to establish a *prima facie* case of retaliation with regard to her reduced work hours and her termination.

Under the McDonnell Douglas framework, Defendant is then given the opportunity to articulate legitimate, non-discriminatory reasons for the actions taken against Plaintiff.  Defendant has offered a number of reasons why Plaintiff's hours were reduced and her employment ended.  But as previously discussed, a reasonable

jury could "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct[.]'" <u>Combs</u>, 106 F.3d at 1538 (quoting <u>Cooper-Houston</u>, 37 F.3d at 605). While Defendant alleges that Plaintiff was not terminated, she disputes this allegation. Defendant also argues that even assuming that Plaintiff was fired, the termination was due to her poor attendance and/or because of personal animosity between Lopez and Plaintiff. [Doc. 84-1 at 16]. But Defendant did not consistently enforce its written attendance policies with respect to numerous employees who were late and failed to report to work without calling. [PSMF ¶ 36; Rule 30(b)(6) Dep. at 208-09; Palacios Dep. at 62-64, 89-91, 95-100]. Furthermore, a jury could find that retaliatory animus, rather than a personal dispute, motivated Lopez and other decisionmakers. Defendant asserts that Plaintiff's work hours were reduced due to a slow down and that Plaintiff's schedule changes were common to all employees. But evidence in the record indicates that Plaintiff's work hours were reduced more than others and that this occurred shortly after she began complaining about discrimination and retaliation. [PSMF ¶ 29; Burnice Dep. at 27-33, 43-46, 53-58, 133-35].

In sum, a reasonable factfinder could conclude that Defendant's proffered reasons are pretexts for retaliation. The court, therefore, **RECOMMENDS** that

Defendant's summary judgment motion [Doc. 81] be **DENIED** on Plaintiff's 42 U.S.C. § 1981 retaliation claim [Doc. 1, Count II] based on the reduction in her work hours and the termination of her employment.

### C.   After-Acquired Evidence

Defendant Infinity Staffing argues that based on "after-acquired" evidence of misconduct by Plaintiff Trice, her "claim for equitable relief is barred and Trice's claim for back pay is limited to the period of time from the date of her last day of work on March 13, 2014 to July 7, 2016, the date of the depositions when the new information was discovered." [Doc. 84-1 at 25]. Defendant's argument is based on the Supreme Court's decision in McKennon v. Nashville Banner Publishing Co., 115 S. Ct. 879 (1995).

In McKennon, the plaintiff, who was terminated during a reduction in force program, filed suit alleging that she had been terminated based on her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* During pretrial discovery, the defendant discovered misconduct by the plaintiff during her last year of employment. At that point, the defendant sent the plaintiff another termination letter advising her that she was terminated for the newly discovered

misconduct.  <u>McKennon</u>, 115 S. Ct. at 882-883.  Because the misconduct was not

discovered until after the plaintiff had been fired for the allegedly unlawful motive, the

Supreme Court held that the evidence could not be used by the defendant as a motive

for the termination; however, the Court stated that "we must consider how the after-

acquired evidence of the employee's wrongdoing bears on the specific remedy to be

ordered."[10]  <u>Id.</u> at 885.  The Court found that "as a general rule in cases of this type,

neither reinstatement nor front pay is an appropriate remedy.  It would be both

inequitable and pointless to order the reinstatement of someone the employer would

have terminated, and will terminate, in any event and upon lawful grounds."  <u>Id.</u> at

886.  With respect to the issue of back pay, the Supreme Court held that, excepting any

other "extraordinary equitable circumstances[,]" the appropriate "calculation of back

pay [is] from the date of the unlawful discharge to the date the new information was

discovered."  <u>Id.</u>  Finally, the Court held that "[w]here an employer seeks to rely upon

after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was

---

[10]In <u>Wallace v. Dunn Construction Co., Inc.</u>, 62 F.3d 374 (11th Cir. 1995), the
Eleventh Circuit Court of Appeals found that the decision in <u>McKennon</u> was
applicable to cases arising under Title VII.  <u>Id.</u> at 378.  The court also held "that the
after-acquired evidence rule announced in <u>McKennon</u> applies to cases in which the
after-acquired evidence concerns the employee's misrepresentations in a job
application or resume, as well as cases in which the after-acquired evidence relates to
employee wrongdoing during employment."  <u>Id.</u> at 379.

AO 72A

(Rev.8/82)

of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." Id. at 886-87; see also Wallace, 62 F.3d at 379 ("In order to benefit from the after-acquired evidence rule . . ., [the defendant] must prove that 'the misconduct revealed by the deposition was so grave that [the plaintiff's] immediate discharge would have followed its disclosure in any event.'") (citation omitted).

In the present case, the court finds that Defendant has failed to show that the after-acquired evidence of Plaintiff's wrongdoing was so serious that immediate termination would have occurred.  Defendant claims that Plaintiff "lied about the reasons she was late or could not come to work." [Doc. 84-1 at 25].  The evidence cited by Defendant is deposition testimony from Greg Dewberry, Plaintiff's husband, who was asked and testified to the following: "Q. While [Plaintiff] was working there, did your car ever break down?  A. No." [Dewberry Dep. at 67:6-8].  Defendant has not explained, and the court will not attempt to guess, how this testimony supports its after-acquired evidence argument.  [Doc. 84-1 at 25].

Defendant also argues that Plaintiff "threated [sic] to engage in physical violence at the workplace." [Id.].  In support of this argument, Defendant cites to the deposition testimony of Doris Carthan, Plaintiff's mother, who was asked and testified

41

to the following: "Q. So [Plaintiff] decided not to go back to work? A. No. She had to stop going to work. She was going to be crazy in jail or somebody going to be hurt." [Carthan Dep. at 60:16-19]. Contrary to Defendant's assertion, Carthan did not testify that Plaintiff threatened violence in the workplace. Instead, Carthan testified that it was her perception that if Plaintiff had continued working, either Plaintiff would "be crazy in jail" or "somebody [would] be hurt." [Id.]. Because Defendant has not "prove[d] that 'the misconduct revealed by the deposition was so grave that [the plaintiff's] immediate discharge would have followed its disclosure[,]'" the court finds that Defendant's after-acquired argument fails. Wallace, 62 F.3d at 379 (citation omitted).

## IV.   Conclusion

Based on the foregoing reasons and cited authority, the undersigned **RECOMMENDS** that Defendant Infinity Staffing's motion [Doc. 81] for summary judgment be **DENIED**.

All pretrial matters have been concluded with the issuance of this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), this Court's Local Rule

42

72.1, and Standing Order 14-01 (N.D. Ga. August 15, 2014).  The Clerk, therefore, is

**DIRECTED** to terminate the reference to the Magistrate Judge.

      **SO RECOMMENDED** this 5th day of July, 2017.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

43