**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

TAMIKA TRICE,

                **Plaintiff,**

    **v.**

INFINITY STAFFING
SOLUTIONS, LLC d/b/a Lyneer
Staffing Solutions,

               **Defendant.**

                         **1:15-cv-3401-WSD**

## OPINION AND ORDER

This matter is before the Court on Defendant Infinity Staffing Solutions,

LLC d/b/a Lyneer Staffing Solutions' ("Defendant" or "ISS") Objections [128] to

Magistrate Judge Janet F. King's Final Report and Recommendation [124]

("R&R"). In her R&R, Magistrate Judge King recommends that Defendant's

Motion for Summary Judgment [81] be denied.

## I.    BACKGROUND

### A.    Facts

#### 1.    Defendant's Takeover at the UPS Warehouse

Plaintiff Tamika Trice ("Plaintiff") is an African-American woman. From

April 2011 to October 2013, she worked as a mail sorter for Staffmark, a

temporary staffing company, at the UPS Mail Innovations Warehouse ("UPS Warehouse"). (Plaintiff's Statement of Disputed Material Facts [95.1] ("PSMF") ¶ 1; [95.3] at 38).[1] In October 2013, Defendant assumed Staffmark's staffing responsibilities for the Sort Department at the UPS Warehouse. (Defendant's Statement of Material Facts [84] ("DSMF") ¶ 1; [87.1] at 69-70; [95.3] at 39). Several Staffmark employees, including Plaintiff, transferred to Defendant and continued working at UPS. (DSMF ¶ 2).[2] Plaintiff received the same pay and continued to work as a mail sorter. (DSMF ¶ 12).

When Defendant replaced Staffmark, African-Americans constituted a majority of the UPS Warehouse staff. ([101] at 11). ISS Supervisor Veronica Burnice ("Burnice") testified, during her deposition, that ISS Executive Vice President Robert Lake ("Lake") told her that UPS wanted Defendant to "diversify" the workforce and "to get more Hispanics." (PSMF ¶ 4). Latisha DeSota ("DeSota") testified that her supervisor, Senior Recruiter Marisel Zayas ("Zayas"), had been instructed by Anwar Ahmed ("Ahmed"), an ISS Support Services Manager, to "hire a diverse workplace other than blacks" and that "she needed

---

[1]     "[Staffmark] hired temporary workers and provided them to other companies that needed temporary labor." ([95.3] at 38).
[2]     "[Defendant] accepted every former Staffmark employee who submitted an application." (DSMF ¶ 2).

more candidates that were not black." (PSMF ¶ 5; [101] at 11-12). Zayas referred to black applicants as "thugs" and "ghetto," and repeatedly directed DeSota to hire non-blacks. (PSMF ¶ 7). For example, while DeSota was speaking with an Asian applicant, Zayas whispered to her, "He's Asian, hire him." ([101] at 32-33). Zayas also instructed DeSota to hire two women "because they were white." ([101] at 89). Zayas hired an equal number of black and non-black applicants to work at the UPS Warehouse, even though approximately 80% of applicants were black. (PSMF ¶ 6). On November 4, 2013, Defendant terminated DeSota's employment, less than a month after she reported concerns about Defendant's discriminatory recruitment and hiring processes. (PSMF ¶ 8).

Burnice testified that, shortly after Defendant replaced Staffmark, Lake walked through the UPS Warehouse and selected several black employees for termination on sight. (PSMF ¶ 10; [95.3] at 40). Burnice said that Lake did not ask her questions about the employees' performance, and that he "seemed to base his [termination] decisions . . . solely on their appearance." ([95.3] at 40). Lake also told Burnice "not to call back" three black employees because they were talking as they worked. ([95.3] at 40-41; PSMF ¶ 10). Later that day, Lake praised two Hispanic employees who talked while they worked, and who worked

more slowly than the black employees that Lake previously criticized.  ([95.3] at 41; PSMF ¶ 10).

 2.     <u>Lopez's Pay Raise Comment and Failure to Prevent Racially Offensive Language</u>

On December 2, 2013, Plaintiff asked ISS Supervisor Carlos Lopez ("Lopez") when she and her colleagues would get a pay increase.  Lopez responded, "If you [were] Mexican, you would already have a raise."  (PMSF ¶ 13).  Plaintiff immediately reported Lopez's comment to Burnice and provided a written statement describing the incident.  (PSMF ¶¶ 14-15).  Plaintiff also complained to Zayas that she "was being discriminated against" and that black employees were having their hours cut.  (PSMF ¶ 15; [83.1] at 122).  Lopez sent Plaintiff home shortly after she complained to Zayas.  (PSMF ¶ 16).  Defendant's disciplinary log states that Lopez sent Plaintiff home for "disorderly conduct" after Plaintiff "initiate[d] conversation . . . regarding pay unfairness based on race." ([95.3] at 49).

Zayas reported Plaintiff's complaint to Lake and Ahmed, who conducted an investigation into the matter.  (PSMF ¶ 17; DSMF ¶ 18).  Plaintiff told Lake about Lopez's comment, stated that she was being discriminated against, and complained that her hours were being cut because she was black.  (PSMF ¶ 17).  Lake spoke with Keyonna Davis, an ISS employee, who provided a written statement and

corroborated Plaintiff's account of Lopez's comment. (PSMF ¶ 18). Lake and Ahmed concluded, based on their investigation, that Plaintiff and Lopez both acted inappropriately and that there was no evidence that African-Americans were denied a pay increase based on race. (DSMF ¶ 20). Lake explained his findings to Plaintiff, stating that Lopez was "not a bad person" and that Plaintiff had "misunderstood" Lopez's comment. (PSMF ¶ 19; DSMF ¶ 21).

Plaintiff and ISS employee Takita Edwards ("Edwards") testified that a Hispanic employee, named Will, often used the word "nigger" around black employees and said it to them directly. ([95.4] ¶¶ 23-26; PSMF ¶ 11; [83.1] at 93-94]. Will, on one occasion, said "I kill all them niggers." (PSMF ¶ 11). Will continued to use the word after Plaintiff and Edwards reported his language to Lopez. (PSMF ¶ 12).

### 3.    Plaintiff's Reduced Work Hours

In December 2013, Lopez assumed control over the work schedule at the UPS Warehouse. ([95.3] at 23; [87.4] at 269; [83.2] at 58). ISS Supervisor Antonio Edler ("Edler") testified that the number of Hispanic employees grew substantially—by a factor of four or five—and that "the African-American ratio dropped tremendously." ([83.7] at 40). Plaintiff was not assigned work from December 29, 2013, through January 7, 2014, which she claimed was unusual.

5

(PSMF ¶ 20; [85.3] at 157-158, 179; [87.4] at 56; <u>see</u> ([95.3] at 23 (Plaintiff stating she "never missed a whole week")).

On January 6, 2014, Plaintiff submitted a written complaint alleging that Lopez removed her from the work schedule because of their "disagreement" on December 2, 2013. (PSMF ¶¶ 21-22; [95.3] at 23). When Lake and Ahmed investigated the complaint, Plaintiff told them that Lopez reduced her hours to retaliate for her complaint about Lopez's comment. ([85.4] at 162, 165; PSMF ¶ 23). Lopez told Lake that he tried to schedule Plaintiff for work but that Plaintiff said she was unavailable to work or she did not answer her telephone. (DSMF ¶ 24). Lopez said he focused on scheduling employees who were more reliable. (DSMF ¶ 24). Lopez also told Lake that there was less work available after the holiday season. (DSMF ¶ 25). Although Lopez and his team were trained to log "every employee concern," Plaintiff's disciplinary log, as of January 6, 2014, did not reflect any attendance or scheduling issues, other than a single day on which she reported car trouble and was unable to come to work. ([95.3] at 49; [87.3] at 177-178; PSMF ¶ 3). Lake instructed Lopez to confirm Plaintiff's availability by telephone and text message, to avoid conduct that could be perceived as retaliation,

to schedule Plaintiff to work as much as possible, and to escalate any further problems to Lake and Ahmed. (DSMF ¶ 27; [85.4] at 51-52).[3]

Plaintiff repeatedly complained to Zayas and Burnice that Lopez cut her work hours because she was black, and in retaliation for her discrimination complaint on December 2, 2013. ([83.2] at 43, 57, 134-135; PSMF ¶ 30). Burnice received similar complaints from other black employees. ([83.2] at 44). Burnice reported these complaints to Lopez, and told him that the black employees "who were displaced to make spots for the Hispanics [were] better at their jobs than the Hispanic people who were replacing them." ([83.2] at 46, 133-134; PSMF ¶ 29). Burnice told Lopez that the staff changes "slowed down the mail processing" at the warehouse. (PSMF ¶ 29).

Burnice testified that Plaintiff's hours "went down tremendously" in the months after ISS replaced Staffmark. ([83.2] at 27-28). Plaintiff worked 43.5 hours in November 2013, 89.75 hours in December 2013, 54.5 hours in January 2014, 43.25 hours in February 2014, and 37.75 hours in March 2014. (DSMF ¶¶ 16, 28, 35; PSMF ¶ 28). Defendant's "peak season" was from late

---

[3]    On January 11, 2014, Plaintiff asked to start work at specific times during the week of January 13, 2014. Lopez sought to discipline Plaintiff for submitting this request. (PSMF ¶ 24; DSMF ¶ 29). Lake told Lopez "not to move forward with the write-up" because "there was nothing inappropriate" about Plaintiff's request. (PSMF ¶ 25; [87.3] at 188-189).

November through approximately December 22, 2013.  ([87.4] at 160, 237).

Although Defendant initially experienced a decline in business after

December 22, 2013, the volume of work went "back up" in the period that

followed.  ([87.4] at 167; PSMF ¶ 28; see also [83.7] at 50 (Edler testifying that

"the mail volume picked up" after Lopez took control of the work schedule)).

    4. Plaintiff's Final Warning

  On March 5, 2014, Lopez, at Lake's direction, issued a written "Final

Warning" to Plaintiff, alleging that she was "not reliab[le] on attendance or

availability" and that it was "hard to communicate with her" about the work

schedule.  (PSMF ¶ 32; DSMF ¶ 32; [81.11]).  A list of Plaintiff's alleged

infractions, beginning December 23, 2013, was attached to the warning.  (PSMF

¶ 37; [95.3] at 36-38).[4]  Although Plaintiff sometimes was late or failed to report

for work, she had not previously received a written warning.  (PSMF ¶ 40; DSMF

¶ 14).  The Final Warning stated:  "Improvement on all areas is expected.  Failure

to comply with policies could be use [sic] for grounds of termination."  ([81.11]).

Plaintiff wrote at the bottom of the Final Warning:  "This is just a reason to get me

---

[4]  The attached version of the disciplinary log omitted the log's first entry, dated December 2, 2013, which stated:  "Ms. Trice admitted to initiate [sic] conversation with a co-worker regarding pay unfairness based on race.  [Lopez] asked Ms. Trice to leave the premises after disorderly conduct."  ([95.3] at 49; PSMF ¶ 37).

terminated. When I want to be on call they don't call. When I call out I do it on time." ([81.11]).

Plaintiff immediately told Zayas that the Final Warning was retaliatory and that its allegations were false. (PSMF ¶ 38). Plaintiff showed Zayas her cell phone, explaining that she had not missed any calls from Defendant's onsite staff. (PSMF ¶ 39). Plaintiff also told Lake that she was being discriminated and retaliated against, that the attendance allegations were false, that she believed Defendant was trying to terminate her, and that she had not previously received a written warning. (PSMF ¶ 40).

Defendant did not consistently enforce its disciplinary policies regarding attendance because "there was a substantial number of employees that were . . . non-compliant with the attendance guidelines." ([87.4] at 209). During the first six months of Defendant's involvement at the UPS Warehouse, 90% of employees failed to report, or reported late, to work at least once, and up to 50% of employees incurred three or more unexcused absences. (PSMF ¶ 36; [86.3] at 62-64, 89-91, 95-100). Edler testified that at least 40% of employees were late more frequently or egregiously than Plaintiff, and that Hispanic employees who were late were treated more leniently than others. ([83.7] at 177-178). Burnice testified

that Plaintiff's attendance was the same as the average employee at the UPS Warehouse.  ([83.2] at 129).

### 5. Plaintiff's Separation from Defendant

Plaintiff did not work at the UPS Warehouse after March 14, 2014.  (PSMF ¶ 41).  On-Site Coordinator Indiana Palacios ("Palacios") testified that, on March 21, 2014, Plaintiff picked up her paycheck from Defendant's office and told Palacios she was no longer "available to work due to issues going on at home." ([88.3] at 111-112).  Defendant then removed Plaintiff from the work schedule because "obviously [Defendant] couldn't confirm her for work."  ([88.3] at 113). Plaintiff testified that she did not ask to be removed from the schedule, did not state that she was unavailable to work, and did not ask to move to a different location.  (PSMF ¶ 42).  Plaintiff further testified that, from mid-March through mid-April 2014, she continued to visit Defendant's office, seeking work hours and asking Zayas why she had been removed from the work schedule.  (PSMF ¶ 45). In April 2014, Plaintiff provided Defendant with a document certifying that she was medically cleared for work.  (DSMF ¶ 38).

### B. Procedural History

On September 28, 2015, Plaintiff filed her Complaint [1], asserting discrimination and retaliation claims under 42 U.S.C. § 1981.  Count 1 asserts that

Defendant "discriminated against [Plaintiff] in the terms and conditions of her contract because of her race by, among other things, reducing her hours, denying her a raise, and terminating her." (Compl. ¶ 78). Count 2 asserts that Defendant "retaliated against [Plaintiff] in the terms and conditions of her contract because she opposed the company's race discrimination by, among other things, threatening her job, reducing her hours, denying her a raise, and terminating her." (Compl. ¶ 87). The Complaint seeks declaratory relief, injunctive relief, back pay, reinstatement or front pay, and attorney's fees. (Compl. at 16).

On October 17, 2016, Defendant filed its Motion for Summary Judgment. On July 5, 2017, the Magistrate Judge issued her R&R, recommending that Defendant's Motion for Summary Judgment be denied. The Magistrate Judge found that there is sufficient evidence to support that Plaintiff's conditions of employment were altered as a result of racial animus, and that there is sufficient evidence that Defendant's claimed reasons for the change in Plaintiff's work conditions were pretextual. The Magistrate Judge further found that a reasonable jury could find that there was a "but for" causal link between Plaintiff's protected activity and her reduction in hours and termination, and that Defendant's claimed reasons for its actions were pretextual. Finally, the Magistrate Judge found that Defendant failed to show its after-acquired evidence of Plaintiff's wrongdoing was

so serious that immediate termination would have occurred.  The Magistrate Judge

recommended that Defendant's Motion for Summary Judgment be denied.

On July 24, 2017, Defendant filed its Objections to the R&R and, on

July 31, 2017, Plaintiff filed her response [129] to the Objections.  Defendant

argues that "[Plaintiff's] story that [Defendant] subjected her to race discrimination

by denying her a raise, reducing her work hours, and terminating her employment

[is] blatantly contradicted by the record."  ([128] at 12).  Defendant argues further

that a reasonable jury could not find that Defendant retaliated against Plaintiff by

reducing her hours and terminating her employment.  ([128] at 21-22).  Defendant

also objects to the Magistrate Judge's rejection of Defendant's after-acquired

evidence defense.  ([128] at 24).

## II.    LEGAL STANDARDS

### A.    Summary Judgment

"Summary judgment is appropriate where the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Ahmed v. Air France-KLM, 165 F. Supp. 3d 1302, 1309 (N.D. Ga.

2016); see Fed. R. Civ. P. 56.  "An issue of fact is material if it 'might affect the

outcome of the suit under the governing law.'"  W. Grp. Nurseries, Inc. v. Ergas,

167 F.3d 1354, 1360 (11th Cir. 1999) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). "An issue of fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Id.</u> at 1361 (quoting <u>Anderson</u>, 477 U.S. at 248).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying [materials] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "The movant[] can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof." <u>Graham v. State Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1281-82 (11th Cir. 1999). The moving party need not "support its motion with affidavits or other similar materials *negating* the opponent's claim." <u>Celotex</u>, 477 U.S. at 323. Once the moving party has met its initial burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. <u>Graham</u>, 193 F.3d at 1282. The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." <u>Id.</u> "[T]he mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48.

"If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted." Apcoa, Inc. v. Fid. Nat. Bank, 906 F.2d 610, 611 (11th Cir. 1990) (internal quotation marks omitted) (quoting Anderson, 477 U.S. at 250). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)); cf. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (a party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict" (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997) (internal quotation marks omitted))).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott, 550 U.S. at 380. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury." Graham, 193 F.3d at 1282. "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." Id.

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex, 477 U.S. at 322-23; see Freeman v. JPMorgan Chase Bank N.A., -- Fed. App'x --, 2017 WL 128002, at *4 (11th Cir. Jan. 13, 2017) (same); Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1247 (11th Cir. 1999) ("If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted.").

B.    Report and Recommendation

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1); Williams v. Wainwright, 681 F.2d 732 (11th Cir. 1982), cert. denied, 459 U.S. 1112 (1983). A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). With respect to those findings and recommendations to which objections have not been asserted, the Court must conduct a plain error review of the record. Slay, 714 F.2d at 1095. In view of Defendant's objections, the Court conducts a *de novo* review of the R&R.

## III.   DISCUSSION

A.    Defendant's Objection to the Finding and Recommendation that Defendant is Not Entitled to Summary Judgment on Plaintiff's Race Discrimination Claim under Section 1981 (Count 1)

Count 1 of the Complaint asserts a race discrimination claim under section 1981. Plaintiff alleges that Defendant discriminated against her by denying her a pay raise, reducing her work hours, and terminating her employment.

1.     <u>Section 1981 Discrimination Claims at the Summary Judgment Stage</u>

Section 1981 provides that all persons "shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C § 1981(a). This includes equal rights in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C § 1981(b). Section 1981 requires a showing of "purposeful discrimination," <u>Ferrill v. Parker Grp., Inc.</u>, 168 F.3d 468, 472 (11th Cir. 1999), and "provides protection only on the basis of race," <u>Rollins v. Alabama Cmty. Coll. Sys.</u>, 814 F. Supp. 2d 1250, 1259 n.1 (M.D. Ala. 2011).

Where, as here, an employee relies on circumstantial evidence to support her section 1981 claims, courts apply the burden-shifting framework set out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[5] <u>See</u> <u>Flournoy v. CML-GA WB, LLC</u>, 851 F.3d 1335, 1339 (11th Cir. 2017); <u>Wright v. Sanders Lead Co.</u>, 217 F. App'x 925, 928 n.3 (11th Cir. 2007). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of intentional

---

[5]     The Court draws on Title VII case law because "the same analytical framework and proof requirements that apply to employment discrimination claims under Title VII also apply to discrimination claims under Section 1981." <u>Surtain v. Hamlin Terrace Found.</u>, 789 F.3d 1239, 1245 n.6 (11th Cir. 2015).

discrimination.  If a prima facie case is shown, the burden shifts to the employer to "produc[e] evidence that its action was taken for some legitimate, non-discriminatory reason." E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002).  "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not* been motivated by discriminatory animus." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 257 (1981)). "Should the employer meet its burden of production, the presumption of discrimination is rebutted, and the inquiry proceeds to a new level of specificity, in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." E.E.O.C., 296 F.3d at 1272-73.  "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." Id. at 1273.

This burden-shifting test "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  "The 'ultimate question' in a disparate treatment case

is not whether a plaintiff has established a prima facie case or demonstrated pretext, but 'whether the defendant intentionally discriminated against the plaintiff.'" Nix v. WLCY Radio/Rahall Comm., 738 F.2d 1181, 1184 (11th Cir. 1984) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)). A plaintiff may defeat a summary judgment motion by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith, 644 F.3d at 1328.

> 2. Whether Plaintiff has Established a Prima Facie Case of Intentional Race Discrimination

Plaintiff may establish a prima facie case of intentional discrimination in several ways, including by showing "(1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008); see United States Postal Serv. Bd. of Gov. v. Aikens, 103 S. Ct. 1478, 1482 (1983) ("The prima facie case method established in McDonnell Douglas was never intended to be rigid, mechanized, or ritualistic.").

a)      Prima Facie Elements 1 and 2:  Whether Plaintiff belongs
        to a Protected Class and was Qualified to do her Job

The Magistrate Judge found, and the Court agrees, that Plaintiff belongs to a

protected class and was qualified to perform her job.  "There is no dispute that

[Plaintiff] is African-American, and [she] therefore falls into a protected class."

Walker v. Thomasville Ford Lincoln, Inc., No. 7:11-cv-83, 2012 WL 5398609, at

*3 (M.D. Ga. Nov. 2, 2012); see Maddox-Jones v. Bd. of Regents of Univ. Sys. of

Georgia, 448 F. App'x 17, 20 (11th Cir. 2011) (noting that African-Americans are

a protected class).  It also is undisputed that Plaintiff, "throughout her

employment," was "a dependable, good employee with a good attitude," and that

she was "an outstanding worker."  (PSMF ¶ 2; [85.4] at 162 ("[Plaintiff was] one

of the fastest, best workers there, very knowledgeable.")).  Plaintiff has established

the first two elements of the traditional prima facie test.  (See [84.1] at 9

(Defendant conceding that Plaintiff belongs to a protected class and was qualified

to perform her job).

b)      Prima Facie Element 3:  Whether Plaintiff was Subjected
        to Adverse Employment Action

Plaintiff claims she satisfies the third element—that she was "subjected to

adverse employment action"—because she was denied a pay raise, her work hours

were reduced, and her employment was terminated.  The undisputed evidence is

that Plaintiff, unlike some of her co-workers, did not receive a pay raise during her employment with Defendant. (DSMF ¶ 12). Plaintiff also has shown that her hours were reduced. After Lopez assumed control over the work schedule, Plaintiff was not assigned work from December 29, 2013, through January 7, 2014. (PSMF ¶ 20; [85.3] at 157-158, 179; [87.4] at 56). Her hours fell from 89.75 hours in December 2013, to 54.5 hours in January 2014, 43.25 hours in February 2014, and 37.75 hours in March 2014. (DSMF ¶¶ 16, 28, 35; PSMF ¶ 28). Burnice testified that Plaintiff's hours "went down tremendously" in the months after Defendant replaced Staffmark. ([83.2] at 27-28). A reasonable jury could find that Plaintiff's work hours were reduced.

A jury also could find that Defendant terminated Plaintiff's employment. Plaintiff did not work at the UPS Warehouse after March 14, 2014. (PSMF ¶ 41). Palacios testified that, on March 21, 2014, Plaintiff picked up her paycheck from Defendant's office and told Palacios she was no longer "available to work due to issues going on at home." ([88.3] at 111-112). Defendant then removed Plaintiff from the work schedule because "obviously [Defendant] couldn't confirm her for work." ([88.3] at 113). Plaintiff testified, however, that she did not ask to be removed from the schedule, did not state that she was unavailable to work, and did not ask to move to a different location. (PSMF ¶ 42). Plaintiff further testified

that, from mid-March through mid-April 2014, she continued to visit Defendant's office, seeking work hours and asking Zayas why she had been removed from the work schedule. (PSMF ¶ 45). In April 2014, Plaintiff provided Defendant with a document certifying that she was medically cleared for work. (DSMF ¶ 38). Based on these facts and the reasonable inferences that can be drawn from them, the Court finds that a jury could believe Plaintiff's testimony and find that she was terminated. See Comer v. City of Palm Bay, Fla., 265 F.3d 1186, 1192 (11th Cir. 2001) (stating that courts, at the summary judgment stage, must "view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party"); see also Lopez v. AT & T, Corp., 457 F. App'x 872, 874 (11th Cir. 2012) ("In the summary judgment context, the court must avoid weighing conflicting evidence or making credibility determinations."). Plaintiff has shown she was subjected to one or more adverse employment actions.

        c)      Prima Facie Element 4: Whether Defendant Treated Similarly Situated Employees Differently or Whether Plaintiff Otherwise Established a Prima Facie Case of Discrimination

Although Plaintiff does not identify a similarly situated comparator outside her class who was treated more favorably, she argues that circumstantial evidence supports a prima facie case of intentional discrimination. (R&R at 21).

22

"[P]laintiff[] can establish a prima facie case, as required by <u>McDonnell Douglas</u> and its follow-on cases, without pointing to a similarly situated comparator." <u>King v. Ferguson Enterprises, Inc.</u>, 971 F. Supp. 2d 1200, 1214 (N.D. Ga. 2013), <u>aff'd,</u> 568 F. App'x 686 (11th Cir. 2014); <u>see</u> <u>Smith</u>, 644 F.3d at 1328 ("[P]laintiff's failure to produce a comparator does not necessarily doom the plaintiff's case."). Plaintiff's only obligation, at the prima facie stage, is to "carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion." <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 358 (1977). The Magistrate Judge found, and the Court agrees, that Plaintiff has met this burden. <u>See</u> <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous.").

On December 2, 2013, Plaintiff asked Lopez when she and her colleagues would get a pay increase. Lopez responded, "If you [were] Mexican, you would already have a raise." (PMSF ¶ 13). This supports an inference that Plaintiff was denied a pay raise because of her race.[6] Other evidence supports a prima facie case

---

[6]    Lopez's remark, and his failure to prevent a Hispanic employee from using the word "nigger" at work, also constitute circumstantial evidence that Lopez reduced Plaintiff's hours based on racial animus. <u>See</u> <u>Damon v. Fleming Supermarkets Of Florida, Inc.</u>, 196 F.3d 1354, 1362 (11th Cir. 1999) (finding that a

that Defendant terminated Plaintiff and reduced her hours because she is black.

Burnice testified that Defendant's Executive Vice President told her that UPS

wanted Defendant to "diversify" the workforce and "to get more Hispanics."

(PSMF ¶ 4).  See Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1292 (11th Cir.

1998) ("[C]omments that are not *direct* evidence of discrimination because they

are either too remote in time or too attenuated because they were not directed at the

plaintiff . . . may provide circumstantial evidence to support an inference of

discrimination.").  DeSota testified that her supervisor was instructed, by senior

management, to "hire a diverse workplace other than blacks" and that "she needed

more candidates that were not black."  (PSMF ¶ 5; [101] at 11-12).  Zayas, a

Senior Recruiter, repeatedly and explicitly directed DeSota to hire non-blacks.

Defendant hired an equal number of black and non-black applicants even though

approximately 80% of applicants were black.  (PSMF ¶ 6; ([101] at 89).

Defendant's Executive Vice President, while walking through the UPS

Warehouse, terminated black employees on sight without seeking information

about their performance.  He selected other black employees for termination

because they were talking while working, but praised two Hispanic employees who

decision-maker's ageist comment to a non-plaintiff was "highly suggestive
circumstantial evidence from which a jury could infer discriminatory animus"
against plaintiff).

also talked while working and who worked more slowly than the black employees. ([95.3] at 41; PSMF ¶ 10). Burnice testified that Lopez scheduled Hispanic employees to work instead of superior black employees, and that this undermined the quality of Defendant's work. ([83.2] at 46, 133-134; PSMF ¶ 29). Edler testified that, after Lopez took control of the work schedule, the number of Hispanic employees grew substantially—by a factor of four or five—and that "the African-American ratio dropped tremendously." ([83.7] at 40). Plaintiff repeatedly complained internally that her hours were cut because she is black. The Magistrate Judge found that a jury could conclude that Defendant intentionally sought to limit the number of black employees at the UPS Warehouse, and that this motivated Defendant to reduce Plaintiff's hours and terminate her employment. The Court agrees with the Magistrate Judge's finding that Plaintiff has established a prima facie case of race discrimination because Defendant denied her a pay raise, reduced her work hours, and terminated her employment.

3.      Whether Defendant Had Legitimate, Non-Discriminatory
         Reasons for Plaintiff's Adverse Employment Actions

Plaintiff having established a prima facie case of discrimination, the burden shifts to Defendant to "produc[e] evidence that its action was taken for some legitimate, non-discriminatory reason." Joe's Stone Crabs, 296 F.3d at 1272. Defendant's burden is "exceedingly light," Walker v. NationsBank of Florida

N.A., 53 F.3d 1548, 1556 (11th Cir. 1995), and is "merely one of production,"

Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000). Defendant "need

only produce admissible evidence which would allow the trier of fact rationally to

conclude that the employment decision had *not* been motivated by discriminatory

animus." Combs, 106 F.3d at 1528. "The defendant need not persuade the court

that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254.

Defendant claims that Lopez was not involved in setting Plaintiff's pay, and

that pay raises were determined on the basis of hours worked, "which had nothing

to do with race." ([84.1] at 19). Defendant states that Plaintiff's hours were

reduced because of "the post-holiday slow down and difficulties in scheduling

her," and that hour reductions "applied across the board without respect to race."

([84.1] at 9, 15). Defendant claims that Plaintiff voluntarily resigned and, even if

she did not, she was terminated because she had "attendance issues" and because

of "the personal animus between [Plaintiff] and Lopez." ([84.1] at 16). The

Magistrate Judge found, and the Court agrees, that Defendant has met its

"exceedingly light" burden of offering legitimate, non-discriminatory reasons for

the adverse employment actions taken against Plaintiff. Walker, 53 F.3d at 1556.

4.     Whether Defendant's Proffered Reasons are Pretextual

Defendant having articulated non-discriminatory reasons for Plaintiff's alleged mistreatment, the burden shifts to Plaintiff to show that Defendant's proffered reasons are pretextual.  Plaintiff can establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Jackson v. State of Alabama State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005).  To establish pretext indirectly, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008); see Chang v. Alabama Agric. & Mech. Univ., 2009 WL 4670423, at *2 (11th Cir. Oct. 23, 2009).  "The evidence of pretext may include . . . the same evidence offered initially to establish the prima facie case."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004); see Ogwo v. Miami Dade Cty. Sch. Bd., No. 15-11190, 2017 WL 2954567, at *1 (11th Cir. July 11, 2017) ("In showing pretext, the plaintiff may rely on the same evidence he relied on in establishing his *prima facie* case.").  "The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient

doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." <u>Combs</u>, 106 F.3d at 1538.

The Magistrate Judge found, and the Court agrees, that a jury could conclude that "a discriminatory reason more likely motivated [Defendant]" to deny Plaintiff a pay raise, reduce her hours, and terminate her employment. <u>Jackson</u>, 405 F.3d at 1289. On December 2, 2013, Plaintiff asked Lopez when she and her colleagues would get a pay increase. Lopez responded, "If you [were] Mexican, you would already have a raise." (PMSF ¶ 13). A jury could believe that Lopez's statement, when considered in the context of other evidence of racial animus, was true, even if Lopez did not exercise direct control over Plaintiff's pay. A jury also could find that Lopez intentionally cut Plaintiff's hours because she was black, thus precluding Plaintiff from working the hours required to trigger a pay increase. Burnice testified that Lopez scheduled Hispanic employees to work instead of superior black employees, that this undermined the quality of Defendant's work, and that Burnice repeatedly raised this issue with Lopez, who failed to address the problem. ([83.2] at 46, 133-134; PSMF ¶ 29). Lopez did not prevent a Hispanic employee, named Will, from using the word "nigger" around black employees. ([95.4] ¶¶ 23-26; PSMF ¶¶ 11-12; [83.1] at 93-94). Several witnesses testified that

senior management wanted to "diversify" the workforce, hire more Hispanics, and reduce the number of black employees in the UPS Warehouse. Defendant hired an equal number of black and non-black applicants even though approximately 80% of applicants were black. A Senior Recruiter repeatedly directed her staff to hire non-blacks based on race. The Executive Vice President, while walking through the UPS Warehouse, terminated black employees on sight without seeking information about their performance. "[T]he record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith, 644 F.3d at 1328 ("[N]o matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.").

A jury also could find that Defendant's proffered reasons for cutting Plaintiff's hours and terminating her employment are "unworthy of credence." Jackson, 405 F.3d at 1289. Defendant states that Plaintiff's hours were reduced because of "the post-holiday slow down and difficulties in scheduling her," and that hours were cut "across the board without respect to race." ([84.1] at 9, 15). Although Defendant initially experienced a decline in business after December 22, 2013, the volume of work went "back up" in the period that

followed. ([87.4] at 167; PSMF ¶ 28). Burnice testified that Plaintiff's—and other black employees'—hours were reduced while Hispanic employees' hours increased. Lopez cut Plaintiff from the work schedule from December 29, 2013, through January 7, 2014, allegedly on the grounds that Plaintiff was unavailable or did not answer her telephone. Plaintiff's disciplinary log, however, does not reflect any scheduling that Plaintiff obstructed during this period. (See PSMF ¶¶ 3). Plaintiff later showed her cell phone to Zayas to show that she did not miss any calls from Defendant's staff. (PSMF ¶ 39).

Defendant's claim that Plaintiff resigned is contradicted by Plaintiff's testimony. Defendant's argument that Plaintiff was terminated for her attendance issues is contradicted by evidence showing that most employees were "non-compliant with the attendance guidelines" and that Defendant did not consistently enforce its disciplinary policies. ([87.4] at 209; see PSMF ¶ 36; [86.3] at 62-64, 89-91, 95-100).[7] Edler testified that at least 40% of employees were late more frequently or egregiously than Plaintiff, and that Hispanic employees who were late were treated more leniently than others. ([83.7] at 177-178). Burnice testified that Plaintiff's attendance was the same as the average employee at the

---

[7]     Defendant's time cards also showed employees clocking in late even though they actually were on time. (PSMF ¶ 47).

UPS Warehouse. ([83.2] at 129). Defendant's proffered reasons for cutting

Plaintiff's hours and terminating her employment suffer from "weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions" such that "a

reasonable factfinder could find them unworthy of credence." McCann, 526 F.3d at

1375-76. There is sufficient evidence, including circumstantial evidence, to permit

a jury to find that Defendant's proffered reasons for Plaintiff's alleged

mistreatment are pretexts for race discrimination. Having conducted a *de novo*

review of the record, the Court agrees with the Magistrate Judge's finding and

recommendation that Defendant's Motion for Summary Judgment on Count 1 be

denied. Defendant's objection to the recommendation that summary judgment not

be granted on Count 1 is overruled.[8]

---

[8]      To the extent Defendant argues that its favorable treatment of other black
employees precludes a finding that Defendant racially discriminated against
Plaintiff, Defendant's argument is inconsistent with authority and is rejected. See
Connecticut v. Teal, 457 U.S. 440, 455 (1982) ("Congress never intended to give
an employer license to discriminate against some employees on the basis of
race . . . merely because he favorably treats other members of the employees'
group."); Brown v. Henderson, 257 F.3d 246, 252-53 (2d Cir. 2001)
("[D]iscrimination against one employee cannot be cured, or disproven, solely by
favorable, or equitable, treatment of other employees of the same race or sex.").

B.  Defendant's Objection to the Finding and Recommendation that
Defendant is Not Entitled to Summary Judgment on Plaintiff's
Retaliation Claim under Section 1981 (Count 2)

Count 2 of the Complaint asserts a retaliation claim under section 1981.

Plaintiff alleges that Defendant reduced her hours and terminated her employment

in retaliation for her complaints about race discrimination.  ([95] at 21-22).

1.  Section 1981 Retaliation Claims at the Summary Judgment
Stage

Section 1981 retaliation claims, like claims for discrimination, are governed

by the McDonnell framework.  "Under this framework, a plaintiff alleging

retaliation must first establish a prima facie case by showing that:  (1) he engaged

in a statutorily protected activity; (2) he suffered an adverse employment action;

and (3) he established a causal link between the protected activity and the adverse

action."  Bryant v. Jones, 575 F.3d 1281, 1307-08 (11th Cir. 2009).  "Once a

plaintiff establishes a prima facie case of retaliation, the burden of production

shifts to the defendant to rebut the presumption by articulating a legitimate,

non-discriminatory reason for the adverse employment action."  Id. at 1308.

"After the defendant makes this showing, the plaintiff has a full and fair

opportunity to demonstrate that the defendant's proffered reason was merely a

pretext to mask discriminatory actions."  Id.

2.     Whether Plaintiff has Established a Prima Facie Case of
       Retaliation

The Magistrate Judge found, and the parties do not dispute, that Plaintiff

engaged in statutorily protected activity because, beginning on December 2, 2013,

she repeatedly complained about racial discrimination and retaliation.  ([84.1] at

20-21; R&R at 34).  For the reasons explained earlier in this Order, the Court also

finds that Plaintiff suffered an "adverse employment action" when her hours were

reduced and her employment was terminated.  (See supra pp. 21-22).

To establish the third element of the prima facie test, Plaintiff must establish

that Plaintiff's discrimination and retaliation complaints were "a but-for cause" of

the adverse employment actions about which she complains.  Jones v. Suburban

Propane, Inc., 577 F. App'x 951, 954-55 (11th Cir. 2014).  "A plaintiff's burden to

prove causation can be met by showing a close temporal proximity between the

statutorily protected activity and adverse-employment action."  Id. at 955.  "A time

period as much as one month between the protected activity and the adverse action

is not too protracted to support causation."  Clark v. S. Broward Hosp. Dist., 601 F.

App'x 886, 897 (11th Cir. 2015).  "[I]n the absence of any other

evidence, . . . three months between the protected activity and an adverse

employment action [is] insufficient to establish causation."  Id.

33

On December 2, 2013, Plaintiff complained about Lopez's discriminatory remark, and Lopez, who was aware of the complaint, dismissed her from work later that day. Less than a month later, Lopez cut Plaintiff from the work schedule for the December 29, 2013, through January 7, 2014, time period. On January 6, 2014, Plaintiff engaged in further protected activity by complaining that Lopez retaliated and discriminated against her. Lopez was aware of Plaintiff's complaint. Evidence supports that Lopez continued to reduce Plaintiff's hours after January 6, 2014. On March 5, 2014, Plaintiff received a Final Warning even though she had not received a written warning previously. Plaintiff immediately complained to Lake and Zayas that the Final Warning was retaliatory and that she was being discriminated against. Evidence supports that Plaintiff was terminated approximately 10 days later, because Defendant declined to put her on the work schedule after March 14, 2014. The temporal proximity between Plaintiff's complaints and the adverse employment actions alleged, is sufficient to demonstrate a causal link and to establish the third element of the prima facie test for retaliation. Id. That Plaintiff received a Final Warning without first receiving a written warning, and that several minor infractions suddenly were alleged against Plaintiff after months without issue, is additional evidence of retaliation against Plaintiff. See Weaver v. Casa Gallardo, 922 F.2d 1515, 1525 (11th Cir. 1991)

34

("The pronounced increase in negative reviews and the careful scrutiny of Weaver's performance . . . is sufficient to establish a causal link."); ([112] at 18 (Plaintiff "was not difficult to reach about scheduling" and "always promptly responded" before Lopez assumed control over the work schedule). The Court agrees with the Magistrate Judge's finding that Plaintiff established a prima facie case of retaliation.

        3.      <u>Whether Defendant has Articulated Non-Discriminatory Reasons and Whether Plaintiff has Shown the Reasons are Pretextual</u>

For the reasons explained earlier in this Order, (<u>see</u> <u>supra</u> pp. 27-31), a jury could find that Defendant's proffered reasons for reducing Plaintiff's hours and terminating her employment are pretextual. <u>See</u> <u>Jackson</u>, 405 F.3d at 1289. Defendant's assertion that Plaintiff voluntarily resigned is contradicted by Plaintiff's testimony. Defendant's alternative argument that Plaintiff was terminated for her attendance issues is contradicted by evidence showing that most employees were "non-compliant with the attendance guidelines" and that Defendant did not consistently enforce its disciplinary policies. ([87.4] at 209; <u>see</u> PSMF ¶ 36; [86.3] at 62-64, 89-91, 95-100). Edler testified that at least 40% of employees were late more frequently or more egregiously than Plaintiff, and Burnice testified that Plaintiff's attendance was the same as the average employee

at the UPS Warehouse. ([83.7] at 177-178; [83.2] at 129). Defendant states that Plaintiff's hours were reduced because of "the post-holiday slow down and difficulties in scheduling her," and that hours were reduced "across the board without respect to race." ([84.1] at 9, 15). Although Defendant initially experienced a decline in business after December 22, 2013, the volume of work went "back up" in the period that followed. ([87.4] at 167; PSMF ¶ 28). Burnice also testified that Plaintiff's—and other black employees'—hours were reduced while Hispanic employees' hours increased. (See, e.g., PSMF ¶ 26). Lopez cut Plaintiff from the work schedule from December 29, 2013, through January 7, 2014, allegedly on the grounds that Plaintiff was unavailable or did not answer her telephone. Plaintiff's disciplinary log, however, does not reflect that Plaintiff obstructed Lopez's ability to schedule her work during this period. (See PSMF ¶ 3). Plaintiff later showed her cell phone to Zayas, explaining that she did not miss any calls from onsite staff, thus discrediting that calls were made to schedule her work. (PSMF ¶ 39). The close temporal proximity between Plaintiff's complaints and the adverse employment actions, combined with Defendant's sudden, increased scrutiny and discipline of Plaintiff, support an inference of retaliatory animus. Having conducted a *de novo* review of the record, the Court agrees with the Magistrate Judge's finding that the evidence supports

that Defendant retaliated against Plaintiff by reducing her hours and terminating

her employment. Defendant's objection to the Magistrate Judge's

recommendation that summary judgment not be granted on Count 2 is overruled.[9]

      C.      <u>Defendant's Objection to the Finding and Recommendation that<br>Defendant's Motion Based on After-Acquired Evidence be Denied</u>

Defendant argues that, under the after-acquired evidence rule, Plaintiff's

"claim for equitable relief is barred and [her] claim for back pay is limited to the

period of time from the date of her last day of work on March 13, 2014 to

July 7, 2016." ([84.1] at 25). July 7, 2016, is the date on which Defendant

allegedly discovered Plaintiff previously engaged in misconduct for which she

would have been terminated. The after-acquired evidence doctrine provides that,

---

[9]      Defendant argues that the Magistrate Judge should have issued a summary judgment ruling on whether Defendant discriminated or retaliated against Plaintiff by "(a) failing to respond to [Plaintiff's] complaints; (b) singling out other employees; (c) falsifying claims against [Plaintiff]; . . . (d) Lopez speaking rudely to her; . . . ([e]) changing her position/duties; ([f]) failing to provide her records; ([g]) failing to provide her with a separation notice; and ([h]) allowing the use of the 'n' word." ([128] at 6-11, 18-21). Plaintiff, however, does not claim these items are "independently actionable adverse employment actions" or "actionable acts of retaliation" that "give rise to a recovery." ([129] at 19, 22-23). Defendant's objection is thus overruled. Defendant's argument that the Magistrate Judge should have issued a summary judgment ruling on whether Plaintiff presented direct evidence of discrimination also lacks merits. ([128] at 11). The Magistrate Judge properly found that Plaintiff's claims rely on circumstantial evidence of discrimination and retaliation, which is sufficient to establish section 1981 claims under <u>McDonnell</u>. (R&R at 17; [129] at 19 n.16).

"in cases in which an employee commits an act during employment that would lead to termination and the employer finds out about the act during the course of litigation, neither reinstatement nor front pay is an appropriate remedy." Wallace v. Dunn Const. Co., 62 F.3d 374, 378 (11th Cir. 1995). Back pay generally "should be calculated from the date of the unlawful discharge to the date the new information was discovered." Id. "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 362-63 (1995); see Wallace, 62 F.3d at 379 ("In order to benefit from the after-acquired evidence rule . . ., [defendant] must prove that the misconduct revealed by the deposition was so grave that [plaintiff's] immediate discharge would have followed its disclosure in any event.").

Defendant relies on two pieces of after-acquired evidence. First, Plaintiff's husband, Greg Dewberry, testified during his deposition that he "normally" drove Plaintiff to work and that the family car did not "break down" during Plaintiff's employment at the UPS Warehouse. ([83.6] at 67). Plaintiff previously told Defendant that she could not get to work on December 23, 2013 and

February 21, 2014, because of "car trouble" and "car issues."  ([95.3] at 48-49).

Second, Plaintiff's mother, Doris Carthan, testified during her deposition that

Plaintiff "had to stop going to work" because of the "discrimination, the prejudice,

[and] the disrespect. . . .  She was going to be crazy in jail or somebody going to be

hurt."  ([83.3] at 60).  Defendant claims this evidence "would have formed a

legitimate basis for an adverse employment action," because Lopez testified that

"lying to a supervisor about the reason for missing work/being late and threatening

to commit acts of violence at the workplace are reasons the company will take

adverse employment action, up to and including termination."  ([81.5] ¶ 3; [128] at

24-25).

Defendant's argument fails because a jury could find that Plaintiff did not lie

to her supervisor and did not threaten physical violence at the workplace.

Plaintiff's statement to her supervisor that she had "car trouble" and "car issues" is

not inconsistent with her husband's testimony that the family car did not

"break down" during Plaintiff's employment at the UPS Warehouse.  Even if it

was, this inconsistency creates an issue of fact for the jury to resolve.

Ms. Carthan's testimony does not establish that Plaintiff threatened violence at the

workplace.  Ms. Carthan stated only that she believed Plaintiff would "be crazy in

jail" or "somebody [would] be hurt" if she had continued working at the UPS Warehouse.

Even if this after-acquired evidence did show Plaintiff lied to her supervisor and threatened workplace violence, Defendant has not established that Plaintiff "in fact would have been terminated on those grounds alone." McKennon, 513 U.S. at 362-63. Lopez testified that Plaintiff's alleged misconduct constituted "reasons the company will take adverse employment action, *up to and including* termination." ([81.5] ¶ 3 (emphasis added)). This shows that Defendant could, but not necessarily would, have terminated Plaintiff for lying to her supervisor and threatening violence. Having conducted a *de novo* review of the record, the Court agrees with the Magistrate Judge that Defendant is not entitled to summary judgment on its after-acquired evidence defense. Defendant's objections are overruled, and Defendant's Motion for Summary Judgment is denied.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Magistrate Judge Janet F. King's Final Report and Recommendation [124] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Defendant's Objection[s] to the Final Report and Recommendation [128] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary

Judgment [81] is **DENIED**.


**SO ORDERED** this 16th day of August, 2017.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE